In re U.S. INTERACTIVE, INC. and U.S. Interactive Corp., Debtors.

Kevin Morris and Lisa Butler, as Litigation Administrators for U.S. Interactive, Inc. and U.S. Interactive Corp., Plaintiffs,

v.

Sampson Travel Agency, Inc., and David J. Sampson d/b/a Sampson Travel and Meeting Masters, Defendants.

Bankruptcy Nos. 01–224, 01–225(MFW). Adversary No. 03–50157(MFW).

United States Bankruptcy Court, D. Delaware.

Feb. 9, 2005.

---

Maureen D. Luke, Delaware City, DE, for debtor.

## MEMORANDUM OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the Complaint of the Litigation Administrators of U.S. Interactive, Inc., and U.S. Interactive Corporation for Avoidance of Preferential Transfers under section 547 of the Bankruptcy Code and the Reply of Sampson Travel ("the Defendant") asserting various defenses. After a trial on the merits, we conclude that judgment should be entered for the Plaintiffs.

## I. FACTUAL BACKGROUND

On January 22, 2001, U.S. Interactive, Inc., and U.S. Interactive Corporation ("the Debtors") filed a petition under chapter 11. The Debtors are affiliated internet professional service companies that provide customer management solutions to clients in the communications and financial services industries. Additionally, they develop, manufacture, and market software.

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

The Defendant has two distinct but related areas of business: corporate travel arrangements and meeting planning. The Defendant booked hotel and airline travel for the Debtors' employees for approximately a year and a half before the Debtors filed for bankruptcy. Approximately 6 months before the bankruptcy, the Defendant began setting up meetings for employees and clients of the Debtors. This new aspect of the relationship began when the Debtors outgrew their ability to plan and book in-house meetings and asked the Defendant for assistance.

When the Defendant scheduled meetings for the Debtors, 15% was due on signing, 75% was due prior to the event, and the remaining 10% was due after the event. Prior to the preference period, the Debtors had promptly paid all invoices in full (which were principally for travel services).

During the preference period, the Debtors changed their payment practice from paying invoices in full to making partial payments. The Defendant applied these partial payments to the outstanding invoices, as detailed below.

| Check No. | Check Date | Check Amount | Invoice Date | Invoice Amount | Invoice Number | Service Date | Days Late |
|---|---|---|---|---|---|---|---|
| 22604 | 11/02/00 | $50,000 | 9/15/00 | $ 99,128.92 | 452 | USI meeting held 8/8–8/11/00 | 48 |
| 22643 | 11/10/00 | $10,000 | 9/15/00 | $ 99,128.92 | 452 | USI meeting held 8/8–8/11/00 | 56 |
| 22926 | 11/30/00 | $10,000 | 8/31/00 | $ 7,248.60 | 255 | USI Leadership summit 8/12–8/16/00 | 91 |
| | | | 9/13/00 | $108,213.29 | 451 | Paramount Hotel 7/21–7/26/00 | 78 |
| 22991 | 12/07/00 | $10,000 | 9/15/00 | $ 99,128.92 | 452 | Planet USI meeting 8/8–8/11/00 | 83 |
| 23120 | 12/14/00 | $20,000 | 9/15/00 | $ 99,128.92 | 452 | Planet USI meeting 8/8–8/11/00 | 90 |
| 23302 | 12/21/00 | $20,000 | 11/24/00 | $ 73,437.57 | 466 | Cancelled Planet USI meeting (10/31/00) moved to 1/23/01 | 27 |
| 23495 | 1/11/01 | $20,000 | 11/24/00 | $ 73,437.57 | 466 | Cancelled Planet USI meeting (10/31/00) moved to 1/23/01 | 48 |

While the invoices requested prompt payment, each payment made during the preference period ranged from 27 to 90 days late.

The Plaintiffs filed the Complaint on January 17, 2003. The Defendants filed their Answer on April 9, 2004. A trial was held on October 21, 2004. The Defendant submitted an additional brief at trial and a post-trial brief on October 28, 2004. The Plaintiffs filed a responsive brief on No-

vember 4, 2004. This matter is ripe for decision.

## II. JURISDICTION

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(b)(2)(F).

## III. DISCUSSION

On September 21, 2001, we confirmed the Debtors' Joint Plan of Reorganization. The Plan granted the Litigation Administrators ("the Plaintiffs") authority to prosecute claims.

The parties have stipulated that the transfers in question meet the requirements of a preferential transfer under section 547(b) of the Bankruptcy Code. Thus, the issues before the Court are whether the transfers fit within the ordinary course of business, new value or mere conduit defenses available under sections 547(c) and 550(a)(1).

### A. Ordinary Course of Business Defense

The Bankruptcy Code provides that a trustee may not avoid a transfer as preferential:

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

11 U.S.C. § 547(c)(2). The Defendant has the burden of proving each element. 11 U.S.C. § 547(g). *See, e.g., Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18

F.3d 217, 223 (3d Cir.1994); *Waslow v. The Interpublic Group of Cos., Inc. (In re M Group, Inc.)*, 308 B.R. 697, 700 (Bankr. D.Del.2004). The parties have stipulated that the Defendant meets the first requirement of section 547(c)(2) because the debts were incurred in the ordinary course of business of both parties.

■ Where there are few transactions between the parties to examine, the ordinary course of business in the industry plays a more prominent role in the analysis than the ordinary course of business between the parties themselves. *AFD Fund v. Transmed Foods, Inc. (In re AmeriServe Food Distr., Inc.)*, 2003 WL 21981543 at *4, 2003 Bankr.LEXIS 945 at *15 (Bankr.D.Del.2003). This requires an objective analysis, comparing the transactions between the debtor and the defendant to others in the industry. *See, e.g., Gulf City Seafoods, Inc. v. Ludwig Shrimp Co., Inc. (In re Gulf City Seafoods, Inc.)*, 296 F.3d 363, 367–68 (5th Cir.2002); *Molded Acoustical*, 18 F.3d at 221. The defendant must establish an industry standard, that is, an agreed practice and manner of payment among its competitors. *AmeriServe*, 2003 WL 21981543 at *3–4, 2003 Bankr.LEXIS at *13–14. Next, the defendant must show that the payments at issue fit within this standard. *Molded Acoustical*, 18 F.3d at 224. This is especially important where payments are late. *Id.* at 228; *McLaughlin v. Hoole Mach. & Engraving Corp. (In re Parkline Corp.)*, 185 B.R. 164, 169 (Bankr.D.N.J.1994).

■ The Defendant argues, however, that it does not need to establish a brightline standard in the industry. Instead, the Defendant argues that the Court should follow the Seventh Circuit's holding that the industry standard is flexible and allows for a broad range of acceptable payment periods. *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir.1993). *See also*

*Morris v. Kansas Drywall Supply Co., Inc., (In re Classic Drywall, Inc.),* 121 B.R. 69, 79 (D.Kan.1990) (allowing a defendant to show irregular or late payments were ordinary where the business environment required flexibility in payment time).

The Plaintiffs disagree. They argue that the relationship between the Debtors and the Defendant is the key to this analysis, relying on *Molded Acoustical,* 18 F.3d at 224. Because that relationship was of short duration, they argue that scrutiny of the industry standard must be rigorous.

We agree with the Plaintiffs. The Third Circuit's test adopts the Seventh Circuit's ruling in *Tolona Pizza* and adds the element of the duration of the parties' relationship. *Molded Acoustical,* 18 F.3d at 220 ("We will embellish the Seventh Circuit test, however, with a rule that subsection C countenances a greater departure from that range of terms the longer the pre-insolvency relationship between the debtor and creditor was solidified."). Therefore, we may not follow *Tolona Pizza,* as the Defendant requests, where our own Circuit has spoken definitively. *United States Trustee v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.),* 180 F.3d 504, 513 (3rd Cir.1999).

In *Molded Acoustical,* the Third Circuit noted:

> Where the relationship between the parties is of recent origin, or formed only after or shortly before the debtor sailed into financially troubled seas, the credit terms will have to endure rigorous comparison to credit terms used generally in the relevant industry.... [I]n those situations there is no baseline against which to compare the pre-petition transfers at issue to confirm the parties would have reached the same terms absent the looming bankruptcy.

18 F.3d at 225–26.

Thus, we may not adopt the flexibility that the Defendant seeks because the par-

ties had only a year-long relationship. *Molded Acoustical,* 18 F.3d at 226. This does not create the kind of significant relationship of which *Molded Acoustical* speaks: a "steady, enduring relationship whose terms have not significantly changed during the pre-petition insolvency period." *Id.* Thus, the burden on the Defendant is to establish a definitive industry standard. *Id.*

The Defendant sought to establish the industry standard through its expert, Robert D. Moses. He posited that payment within 30 to 45 days of the invoice was "ideal." He later expanded the "industry standard" to 60 days past invoice:

> The actual payment practice is—really across the board. There is no one figure you can point to and say its always done within 45 days or its always done within 60 days or anything like that. But in my industry experience, you know 45 days is a good target to shoot for.

(Tr. at 135.) However, Moses did not provide any basis or statistical analysis for this conclusion. The Plaintiffs assert that this testimony was insufficient to establish a definitive industry standard.

We agree with the Plaintiffs. Courts have rejected evidence of an industry standard where it is too general. *See, e.g., Advo–System, Inc. v. Maxway Corp.,* 37 F.3d 1044, 1051 (4th Cir.1994). Instead, courts look for objective, definitive evidence supported by specific data to meet the burden of proof. *See, e.g., Hechinger Liquidation Trust v. Rager (In re Hechinger Invest. Co. of Del.),* 298 B.R. 240, 242 (Bankr.D.Del.2003) (rejecting hearsay statements generalizing about the industry standard); *Harbour v. ABX Enters. (In re APS Holding Corp.),* 282 B.R. 795, 803 (Bankr.D.Del.2002) (finding testimony

where the witness "guessed" about what would comply with the standard was inconclusive); *Sacred Heart Hosp. of Norristown v. E.B. O'Reilly Serv. Corp. (In re Sacred Heart Hosp. of Norristown)*, 200 B.R. 114, 119 (Bankr.E.D.Pa.1996) (rejecting the defense because "the evidence presented by the Defendant was totally lacking in specificity, consisting merely of broad estimates of a wide range of delay time in payments"); *Parkline*, 185 B.R. at 166 (holding that the industry norm was established by expert who presented percentages of the industry making late payments).

The Defendant's expert did not present any statistics or other objective basis for his conclusions. Further, he did not testify that 45, 50 or 60 days was, in fact, the payment terms in the industry, but only, a "good target to shoot for." We conclude that this is insufficient to meet the Defendant's burden of proof to establish an ordinary course of business defense under section 547(c)(2)(C).

### B. *New Value Defense*

▮ The Defendant also asserts a new value defense. A creditor may retain a preferential payment if the creditor gave new value to the debtor in exchange for the transfer. 11 U.S.C. § 547(c)(4). *See, e.g., New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.)*, 880 F.2d 679, 679 (3d Cir.1989). The Code provides that the trustee may not avoid a preferential transfer:

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise un-

avoidable transfer to or for the benefit of such creditor;

11 U.S.C. § 547(c)(4). The Code defines new value as money, or money's worth of goods. 11 U.S.C. § 547(a)(2). Provision of services fits within this exception. *See, e.g., Claybrook v. Pizza Hut, Inc. (In re Discovery Zone, Inc.)*, 300 B.R. 856, 860 (Bankr.D.Del.2003) (defining value as anything that would support a contract).

To obtain relief under this section, the Defendant must establish:

First, the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b). Second, *after* receiving the preferential transfer, the preferred creditor must advance "new value" to the debtor on an unsecured basis. Third, the debtor must not have fully compensated the creditor for the "new value" as of the date that it filed its bankruptcy petition.

*New York City Shoes*, 880 F.2d at 680 (emphasis in original); *APS*, 282 B.R. at 800.

▮ To fit within the exception, the Defendant must show that the transfer was made before new value was given. *New York City Shoes*, 880 F.2d at 682. Value is deemed given on the date the services are performed. *First Jersey*, 180 F.3d at 511.

The Defendant argues that the services it provided in rescheduling a meeting at the Hotel Sofitel for the Debtors from October 31, 2000, to January 23, 2001, represented new value. The Defendant argues that it provided new value to the Debtors by rescheduling the meeting without the Debtors incurring a penalty. Those services were billed on November 24, 2000, after the Defendant had received $60,000 from the Debtor during the preference period. As of the petition date, $33,437.57 of the November 24 invoice remained unpaid. Thus, the Defendant as-

serts that $33,437.57 of that invoice is new value which should be offset against the other preferences.

The Plaintiffs disagree with this analysis. They argue that there was no benefit conferred by the services. Instead of representing services rendered in rescheduling the October meeting, the Plaintiffs assert the invoice was an estimated bill for work to be performed later in connection with the January meeting. Therefore it does not represent services rendered for the Debtors. Alternatively, the Plaintiffs argue that the invoice is for penalties, not services rendered. Finally, the Plaintiffs argue that the services, if any, were not rendered by the Defendant but by the hotels. Thus, the Plaintiffs argue the invoice does not represent money, or money's worth of services.

Without determining the Plaintiff's arguments, we conclude that the Defendant cannot rely on the new value exception because it failed to establish the timing of the transaction. The Defendant never proved when the services represented by the November 24 invoice were performed. Without establishing that, we cannot determine if the services were performed before or after the preference payments the Defendant seeks to offset. *New York City Shoes*, 880 F.2d at 682. Consequently, we conclude that the Defendant has failed to meet its burden of establishing a new value defense. *See, e.g., TWA Inc. Post Confirmation Estate v. City & County of San Francisco Airports Comm'n (In re TWA Inc. Post Confirmation Estate)*, 305 B.R. 221, 228 (Bankr.D.Del.2004) (holding that defendant must prove when the services were rendered to establish that the new value exception applies).

## C. *Mere Conduit Defense*

■■■■■ The Defendant's final argument rests on section 550(a)(1) of the Code. This section provides an exception to the trustee's ability to recover a preferential transfer:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 547 ... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made ....

11 U.S.C. § 550(a)(1). Courts interpreting this section have held that, where a party was the initial transferee but did not retain the transfer, the party to whom the transfer ultimately went should be responsible for its return. *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir.1988). Thus, this section provides a defense to those who can show that they were a "mere conduit" in passing the preferential transfer to another. *Christy v. Alexander & Alexander of New York Inc. (In re Finley, et al.)*, 130 F.3d 52, 58 (2d Cir.1997).

■■■■■ Use of this exception requires that the defendant lack "dominion" over the property, that is, the right to put the money to one's own use. *Official Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants, Inc.)*, 287 B.R. 41, 46 (Bankr.D.N.J.2002) ("to have dominion and control means to be capable of using the funds for 'whatever purposes he or she wishes, be it to invest in lottery tickets or uranium stocks.'" (quoting *In re Anton Noll, Inc.*, 277 B.R. 875, 879 (1st Cir. BAP 2002))). To establish this defense, the defendant must show the payment merely slipped through his hands to another party. *See, e.g., Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1196 (10th Cir.2002); *Finley*, 130 F.3d at 57; *Lowry v. Sec. Pac. Bus. Credit, Inc.*

*(In re Columbia Data Prods., Inc.)*, 892 F.2d 26, 28 (4th Cir.1989); *Bonded,* 838 F.2d at 893.

The Defendant claims it was a "mere conduit" in this case. While the payments were deposited into the Defendant's bank account, the Defendant argues that the funds were not put to the Defendant's own use or purpose. Instead, they were forwarded to hotels and airlines to pay for the meetings scheduled on behalf of the Debtors.

The Plaintiffs argue that the mere conduit defense is inapplicable here. They argue that the Defendant never established at trial that it merely passed the checks from the Debtors to the hotels. The Plaintiffs argue that the Defendant had dominion and control over the money because it went into the Defendant's general operating account from which a variety of parties were paid.

We agree with the Plaintiffs. At trial, the Plaintiffs showed that the Defendant had several bank accounts. Money flowed into the accounts and was distributed as the Defendant saw fit. This shows that power over the money rested with the Defendant, not a third party. The essence of dominion is the power to control or direct resources. *Bonded,* 838 F.2d at 893. In this case, the Defendant did have the power to decide who to pay with the funds received from the Debtors, including the Defendant's own creditors. Possessing such power, the Defendant does not fit within the exception of section 550(a)(1). Therefore, the Defendant has failed to establish any defense to the preference action brought by the Plaintiffs.

## IV. *CONCLUSION*

For the reasons stated above, we will enter judgment in favor of the Plaintiffs in the amount of $140,000.00.

An appropriate order is attached.

### *ORDER*

AND NOW this **9th** day of **February, 2005**, after trial of this proceeding on and upon consideration of the parties' respective post-trial submissions, it is hereby

**ORDERED** that Judgment is entered in favor of the Plaintiffs, KEVIN MORRIS and LISA BUTLER, and against the Defendant, SAMPSON TRAVEL AGENCY, in the amount of $140,000.